IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville May 21, 2013

**STATE OF TENNESSEE v. AARON TATE**

**Appeal from the Criminal Court for Shelby County**
**No. 1007532     James M. Lammey, Judge**

**No. W2012-00462-CCA-R3-CD  - Filed December 18, 2013**

The Defendant-Appellant, Aaron Tate, was convicted by a Shelby County jury of one count of attempted especially aggravated robbery; one count of especially aggravated burglary; one count of employment of a firearm during a felony offense; one count of especially aggravated kidnapping; one count of aggravated kidnapping; two counts of aggravated assault; and one count of facilitation to commit aggravated assault.  The trial court sentenced Tate as a Range II, multiple offender and ordered each of his sentences to be served consecutively, for an effective sentence of one-hundred-thirty-eight years' imprisonment.  In this appeal, Tate argues that the jury was not provided with an instruction consistent with State v. White, 362 S.W.3d 559 (Tenn. 2012); therefore, his "convictions for especially aggravated kidnapping and aggravated kidnapping offend due process."  He further argues that the trial court imposed an excessive sentence.  Upon our review, we conclude that the absence of an instruction pursuant to White was harmless beyond a reasonable doubt as to Tate's convictions for attempted especially aggravated robbery, aggravated burglary, and facilitation of aggravated assault.  However, the lack of the White instruction was reversible error as to his convictions for aggravated assault charged in counts six and seven.  Accordingly, we reverse Tate's kidnapping convictions charged in counts four and five and remand the matter for a new trial as to those offenses.  We modify count two and reduce the especially aggravated burglary conviction to aggravated burglary and  remand for resentencing on this conviction.  We reverse Tate's conviction for employing a firearm during the commission of a dangerous felony offense and remand for a new trial on count three.  In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are**
**Affirmed in Part and Reversed in Part; Case Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Janine N. Oleaga (on appeal), and Juni Ganguli (at trial), Memphis, Tennessee, for the Defendant-Appellant, Aaron Tate.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Rob Ratton, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

In the early morning hours of May 26, 2010, Aaron Tate and Curtis Keller broke into the home of Tamika Jones located at 454 South Main Extended in Collierville, Tennessee.[1] Ms. Jones, her two teenage sons, J.G. and M.B.,[2] and her boyfriend, Andrew Morrow, were at home asleep. During the burglary, J.G. managed to call the police, and Tate and Keller were apprehended while leaving the home. Based on this event, Tate was indicted for the offenses listed in the below chart.[3]

| COUNT | OFFENSE | VICTIM |
| --- | --- | --- |
| ONE | attempted especially aggravated robbery by the use of a deadly weapon and causing serious bodily injury | Andrew Morrow |
| TWO | especially aggravated burglary of a habitation causing serious bodily injury | Andrew Morrow |

---

[1] Curtis Keller, a codefendant in this case, similarly appealed his convictions stemming from these charges. This court affirmed his convictions in part and reversed in part in State v. Curtis Keller, No. W2012-00825-CCA-R3-CD, 2013 WL 3329032 (Tenn. Crim. App. June 27, 2013).

[2] In an effort to protect the anonymity of minor victims, this court will refer to them by their initials only.

[3] Tate was also charged with being a convicted felon in possession of a handgun; however, this count was dismissed after the trial.

-2-

| | | |
|---|---|---|
| THREE | employment of a firearm during a felony offense | N/A |
| FOUR | especially aggravated kidnapping by use of a deadly weapon | M.B. |
| FIVE | especially aggravated kidnapping by use of a deadly weapon | Tamika Jones |
| SIX | aggravated assault by use of a deadly weapon and causing fear of bodily injury | M.B. |
| SEVEN | aggravated assault by use of a deadly weapon and causing fear of bodily injury | Tamika Jones |
| EIGHT | aggravated assault by use of a deadly weapon and causing fear of bodily injury | Andrew Morrow |

The following proof was presented in a joint trial.

Officer Christopher Davidson of the Collierville Police Department responded to a "burglary in progress call" at the victim's house at around 3:36 a.m. His emergency equipment was activated as he approached the area but he "turned it off and went dark before he entered the neighborhood." Upon arrival at the victim's house, he observed a "dark-colored sedan" parked on a street close to the house. He and his partner ran toward the house, and the sedan "stopped in front of the house . . . for a moment then continued on." He "heard screaming and yelling coming from the front room - - glass breaking and somebody yelling for help." He identified photographs of the area in which the sedan was located as well as photographs of the interior and exterior of the house.

While Officer Davidson and his partner maintained a security position around the exterior of the house, they heard something on the north side of the building hit the ground. Officer Davidson said that he heard footsteps, a chain-link fence rattle, and the sound of someone running away. As Officer Davidson entered the home from a back entryway, Curtis

Keller, the codefendant, met him at the door. Keller told Officer Davidson that he was a victim, that there were three people in the house who were trying to rob him, and that he was terrified. Officer Davidson secured Keller, entered the home, and observed Andrew Morrow with severe cuts and wearing a blood-soaked t-shirt. Officer Davidson then spoke with all of the victims. Morrow identified codefendant Keller as the perpetrator of the offense, and the other victims confirmed that there were three men who broke into their home and attempted to "extort jewelry and money and drugs from Mr. Morrow."

Officer Davidson said that Detective Riley recovered a pistol magazine clip inside a bedroom in the house. He described the interior of the house as follows:

> The back bedroom was strewn all about. There was blood all over tables. Tables were turned over. There was blood on comforters that were thrown about. There was - - pretty much the whole room was in disarray. There was blood on the walls.

On cross-examination, Officer Davidson confirmed that no guns were recovered from the house or from codefendant Keller. Although he observed approximately five grams of marijuana "scattered about" the home, he did not believe anyone was charged with this offense. On redirect examination, Officer Davidson said that a mask and gloves were recovered from the sofa area inside the house. He said that Jones told him that codefendant Keller was wearing them during the burglary.

Officer Noel Tipler of the Collierville Police Department testified that he responded to the north side of the victim's house on the morning of the offense. He said other officers were on the scene prior to his arrival. As he approached the house, he heard a man and a woman scream for help. Using a photograph, he showed the jury the north side of the victim's house. He stated that as he was coming through the yard, he saw two officers attempting to take Tate into custody after he had apparently jumped out a window. He assisted the officers and placed Tate in his patrol car. Officer Tipler identified photographs of the area surrounding the house, including a photograph of the window Tate was exiting. After he processed Tate at the jail, Officer Tipler returned to the scene. He said he found "tracks leading to the side of the house . . . over a fence here." He followed the trail to another fence and a back road, which led him to opine that another individual may have gotten into a car. On cross-examination, Officer Tipler affirmed that the screams from the house occurred simultaneously with Tate's exiting the window of the house. He further clarified that he did not observe Tate exit the home.

Within forty-five seconds to a minute of a "burglary in progress call," Officer Christopher Rossie of the Collierville Police Department responded to the victim's house.

He testified, in large part, consistently with the testimony of his partner, Officer Davidson. In addition, he said that as he approached the house he heard a man and a woman screaming for help. While Officer Davidson was positioned toward the back of the house, Officer Rossie went to the front of the house. As he rounded the corner to the north side, Officer Rossie heard a "loud noise of something hitting the side of the house" and then observed Tate jump out a window of the house. Officer Rossie told Tate to get on the ground, and Tate complied. Officer Rossie said that when Tate jumped out the window, he was wearing a "bluish-colored stocking cap type - like a nylon material on his head."

A .45 semi-automatic Llama was recovered from the bushes underneath the window from which Tate jumped. Officer Rossie opined that "the loud thud against the house" was consistent with a gun hitting the house immediately before Tate jumped out the window. A photograph of the gun in the area from which it was recovered was shown to the jury. Officer Rossie said that the magazine clip was missing from the gun and that blood and human hair appeared to be on the gun. Upon securing the house, Officer Rossie observed signs of forced entry into the house including a footprint on the door leading into the house from the carport and a broken doorframe.

On cross-examination, Officer Rossie confirmed that no weapons were found on codefendant Keller or inside the house. He believed that a magazine clip that was found in a bedroom inside the house matched the gun recovered from underneath the window outside of the house.

Detective Michael Riley of the Collierville Police Department testified that he was primarily responsible for collecting the evidence from the scene in this case. Detective Riley also photographed the interior and exterior of the house. He collected a black ski mask and a glove located on a couch inside the house, a blue "do-rag/mask, and a pair of gloves" recovered from Tate, a magazine clip for a .45 caliber gun recovered from inside a bedroom in the house, and a .45 caliber gun that was found outside the window from where Tate jumped. All of these items were admitted into evidence. Detective Riley recovered a cell phone from Tate after he was processed at the jail and determined that phone calls were made during the instant offense. The day after the offense, Detective Riley recovered another gun, a Caltech nine-millimeter, from the backyard of a residence near the victim's house.

On cross-examination, Detective Riley said that he did not perform any testing on the glove recovered from the couch. He also said that there was no blood on the magazine clip recovered from the bedroom inside the house.

Officer Jason Ehrat of the Collierville Police Department responded to the victim's house "about five or six minutes after the call went out." Upon arrival, he approached the

north side of the house, met with other officers, and observed Tate jump out the window of the house. He took Tate into custody, and the other officers secured the house. He said that Tate was wearing "a mask or a hat . . . some kind of skull cap" when he jumped. Officer Ehrat confirmed that as Tate was exiting the window he heard a loud noise that was later identified as a gun. Officer Ehrat assisted in securing the house and observed that the victims were very "distraught" and "shaken up." On cross-examination, Officer Ehrat agreed that there was nothing unusual about the hat or the single glove that was recovered from the house. Although Officer Ehrat heard a thud noise as Tate was exiting the window, he did not see Tate in physical possession of a gun.

Officer William Hill of the Collierville Police Department said that he responded to a call from the homeowner of 439 Starlight Drive, which borders the victim's house. Sometime after noon on the day of the offense, the homeowner of 439 Starlight was outside cleaning his pool and found a gun in his backyard. Officer Hill identified the Caltech nine-millimeter gun as the gun that was recovered from the homeowner's backyard. On cross-examination, Officer Hill agreed that there was no indication that the gun had been tested or analyzed for fingerprints.

Lieutenant Kenneth Rowlett of the Collierville Police Department testified and responded to the victim's house on the morning of the offense. He eventually handcuffed and searched Keller, who Lieutenant Rowlett described as a large man, before taking him into custody. Lieutenant Rowlett coordinated the effort to apprehend a potential third suspect in the offense and contacted Detective Riley, the on-call detective for the area, to advise him of the situation. On cross-examination, Lieutenant Rowlett agreed that Keller did not have any blood on him when he was taken into custody.

J.G., age seventeen, testified that at the time of the offense he lived at 454 South Main with his younger brother, M.B., their mother, Tamika Jones, and her boyfriend, Andrew Morrow. At around 3:00 a.m. on the morning of the offense, he was watching television and talking on the phone. He was about to turn off the television and go to bed when he heard a "big boom" and "footsteps running through his house." After he heard his mother scream, he ran to his closet and shut the door. He knew there was more than one person inside his house based on the number of footsteps he heard. While inside the closet, he called 911. He confirmed that the voice on the 911 tape, played for the jury and admitted into evidence, was his.

J.G. said that one of the burglars came into his room and kicked his door down. The man came straight to his closet, had his hand on his gun, and told J.G. to slide across his bed. When J.G. complied, he slid his cell phone underneath the pillow so the man would not know that he had been on the phone. J.G. said that the man took him to his brother's room and kept

him separated from his brother and mother. He said his mother's room was "completely destroyed" and that the "big guy" went through her dressers.

J.G. said that he could hear the burglars talking to someone on the phone while they were inside his house. He could also hear his mother crying. He overheard the burglars say, "'They were going to kill us and leave.'" J.G. assumed that the person on the phone with the burglars told them the police had surrounded the house because the burglars became scared and began looking for a way to flee the house. After the burglars left, J.G. joined his mother, brother, and Morrow outside with the police. J.G. was unable to identify which man had a gun. He agreed, however, that the men appeared to know each other and worked "as a team" during the burglary.

On cross-examination, J.G. agreed that he saw only two men during the burglary. He said that the man who came to his room had a gun but the larger man going through his mother's dressers did not. He agreed that this observation was omitted from his initial statement to the police.

Andrew Morrow, along with his girlfriend and her two teenage sons, lived at 454 South Main Extended on the morning of the offense. He testified that he had just fallen asleep and heard a loud boom. He dismissed the noise, reasoning that the boys were playing or wrestling. When he turned over in his bed, a man was holding a gun in his face. His girlfriend repeatedly screamed, "What's going on . . . we ain't got nothing – we ain't got no money – we work every day." The man then started beating Morrow with the gun. Morrow said that the man beating him was wearing all black and that all of the men in the house wore ski masks. His girlfriend screamed "'You want some jewelry?" and the man replied, "'Yeah.'" The man continued to beat Morrow about the head. Morrow eventually grabbed the gun and struggled with him over it.

Morrow said that he "busted the window trying to yell for help." However, he was unable to scream loudly because blood was running down his eyes, throat, and ears. His girlfriend was screaming because one of the burglars said, "'Do you see what you're fixin' to make me do?" while holding a gun on her younger son, M.B. At this point, Morrow began to pray. He testified that, "all of a sudden when I prayed . . . I heard a knock - said, 'Collierville police.' I said, 'Thank God.'" Morrow followed the men and tried to hold one of the men as they attempted to flee from the police. He identified Keller at trial as the larger man who burglarized his home armed with a gun. He said there were three men working in concert during the burglary of his home and that each one of them had a gun. He said he saw Keller's face, but the other men wore ski masks, even after they were arrested by the police. He said the ski mask recovered from his couch did not belong to him. He said he heard Keller on the telephone during the burglary, but he could not hear what was said.

Morrow said he suffered at least ten blows to his head during the burglary. As a result, he was taken to the hospital and received forty-two stitches and sixteen staples. He said he still had scars from the beating he endured during the offense, which he displayed to the jury. He described his pain as "a hell of a pain I ever had in my life." He denied inviting the burglars into his home. Asked what the men attempted to take from him, Morrow said

> I didn't have nothin' - - they were asking for money, but I ain't have no money. You know. I work everyday. You know, I pay – lottery scratch off and everything, but I don't have nothin – I'm just a poor man trying to make it like everybody else.

On cross-examination, Morrow conceded that he smoked marijuana or "weed" and had "one shot" of vodka before he went to bed that night. He affirmed that Keller had a gun and cell phone, but he could not remember in which hand Keller held the gun. He also clarified that Keller was not the man who beat him during the offense. He described the man who beat him as "the skinny tall guy." He said he did not know the men who broke into his house.

M.B., age sixteen, testified that on the morning of the offense he lived at 454 South Main Extended with his brother, mother, and her boyfriend. He was watching television around 3:00 a.m., and his mother told him to go to bed. He went to his room, turned on the radio, and was almost asleep when he heard a "big boom." He stated that three people with guns came into his house. He referred to the man who came into his room as the "skinny one," who was wearing a blue mask. This man came into his room and told him to get up. He showed the man around his house and was then told to "'[l]ay down on the ground'" in his mother's room. His mother was screaming in a corner in the room, and the men were beating Morrow. The "big dude" said, "'Get [Jones] quiet[,]'" and his mother managed to make her way to M.B. The men threw a sheet over M.B. and his mother, and the skinny man put his foot on M.B.'s back.

M.B. and his mother tried to escape from her bedroom but were stopped by the larger man, who forced them back into the bedroom at gunpoint. M.B. said his mother was screaming for his brother, and the men went to his brother's room. M.B. saw his brother's feet as the men led his brother to another room. At one point, the skinny man told M.B. to "get up [and] put the gun to [M.B.'s] head." Although it appeared to M.B. that the larger man was in control during the burglary, he testified that the skinny man said, "'Look at this little boy. Do you see him? If you don't give me the stuff, we're going to kill him.'" Asked if he felt he was being used as bait or held as a hostage, M.B. replied, "Yes, sir." He also testified that all three men inside his house had guns. During the burglary, M.B. was afraid and feared for his life.

-8-

Tamika Jones testified that on the morning of the offense she lived at 454 South Main Extended in Collierville, Tennessee. Her testimony was consistent, in large part, with the testimonies of her two sons, J.G. and M.B., and her boyfriend, Andrew Morrow. In addition, she said that when the men entered her house they repeatedly asked, "Where its [sic] at?" She identified Keller at trial as the larger man who burglarized their home on the night of the offense. She explained that she was able to see Keller's face during the burglary because he took off his mask and threw it on the couch before he walked out the door.

Codefendant Curtis Keller, a Memphis native, testified on his own behalf. After his family business closed, Keller moved to Dallas, Texas and engaged in drug trafficking. He said that he sold marijuana throughout Dallas, Nashville, Jackson, Grand Junction, and Memphis. He met Andrew Morrow through a friend "about seven or eight months" prior to the instant offense. He sold large quantities of marijuana to Morrow for the purpose of resale "numbers of times." Keller explained that he would sell Morrow a pound of marijuana for $700, and Morrow would resell it for $850 to $900. Keller said that on May 23, 2010, he met with Morrow because Morrow wanted to purchase fifteen pounds of marijuana. Keller agreed to sell Morrow the marijuana and allowed Morrow to pay him for the purchase a few days later, as he had done in the past.

According to Keller, some time after the purchase, Morrow claimed that he could not repay Keller because someone had stolen the money and the drugs. Keller determined that this was not true and that Morrow had lost the money gambling at a crap house. When Keller attempted to talk to Morrow about it, Morrow slammed the door in his face. Keller knew that Morrow lived with his girlfriend but did not know that children lived with him. Keller said that he returned to Morrow's house with two friends. When no one came to the door, they "bust[ed] the door open and went in." Keller said he "just wanted to get [his] money so [he] could leave and go on back to Dallas, Texas, because, you know, [he] owed people."

Keller testified that he went into the room where Morrow and his girlfriend were in bed. He said that no children were in the room. Keller demanded his money, and Ms. Jones began to scream about her children. Keller insisted that he was only attempting to get the money and drugs owed to him and said,

> [I]f she weren't screaming and hollering to go get her kid - - you know that's how the boy were able to call 911. It weren't no intention about no kid - - Ms. Tamika Jones or nothing. Our basis was Andrew Morrow. Those kids didn't owe me nothin'. I didn't know they was in the house. . . . If Andrew Morrow wouldn't have tried to grab the gun, he wouldn't have been bust open or none of that.

Keller claimed that he only had his cell phone inside the house and not a gun. He did not see one of the teenage boys being brought into the bedroom by someone else and said that all four victims were ultimately in the corner in the same bedroom. He agreed that as he was on his cell phone during the offense, the police responded to the house. He also agreed that he let the other two men know that the house was surrounded by the police. He was wearing a black ski mask and one glove during the offense, which he took off and laid on the couch prior to leaving the house. Finally, he agreed that he met the police when he exited the house and told them that he had been robbed because he had not been given his drugs or money.

On cross-examination, Keller agreed that Tate and another individual named "Little Ronnie" were the two men with him during the offense.

Based on the above proof, the jury convicted Tate of attempted especially aggravated robbery, especially aggravated burglary, employing a firearm during the commission of a felony, especially aggravated kidnapping, aggravated kidnapping, two counts of aggravated assault, and facilitation of aggravated assault.

**Sentencing Hearing.** At the January 17, 2012 sentencing hearing, the trial court reviewed Tate's presentence report and determined that he was a Range II, multiple offender. The presentence report reflected that Tate had a prior conviction for kidnapping and for robbery, both Class C felonies. He also had three prior convictions for simple possession of a controlled substance. See T.C.A. § 39-17-418 (2006). Although simple possession is normally a Class A misdemeanor, the third offense under this section is a Class E felony. See id.

The trial court found the following six enhancement factors applicable to all eight of Tate's convictions: that he had a previous criminal history, in addition to that necessary to establish the appropriate range, T.C.A. § 40-35-114(1); that he was a leader in the commission of the offense with two or more criminal actors, id. § 40-35-114(2); that the offense involved more than one victim, id. § 40-35-114(3); that he treated, or allowed a victim to be treated, with exceptional cruelty, id. § 40-35-114(5); that he previously failed to comply with the conditions of a sentence involving release into the community, id. § 40-35-114(8); and that he had no hesitation about committing a crime when the risk to human life was high, id. § 40-35-114(10). The court placed "great weight" in enhancement factor (1). In addition, the trial court applied enhancement factor (9), that Tate possessed a deadly weapon during the commission of the offense, to his conviction for especially aggravated burglary under count two. Id. § 40-35-114(9). The trial court did not find any applicable mitigating factors under Tennessee Code Annotated section 40-35-113.

For his prior convictions for kidnapping and robbery, Tate had received a three-year sentence of probation. The trial court found that Tate previously violated the conditions of this probation and made the following observation:

> He was given an opportunity, at that point, to straighten his life out. It's rather troubling to note that he got probation on that, and he squandered that probation by going above and beyond those facts and having a home-invasion robbery. So, that shows me he's a danger to society - definitely. But he's learned nothing from that situation.

In regard to the case sub judice, the trial court stated:

> I remember, very well, the testimony of the young man who was in the closet. If there ever was a time in a person's life when they were frightened, almost to death, it was at that point. And to think that if he hadn't had the thought - the forethought or the where-with-all to jump in the closet with his cell phone and call the police, they may not be here. That's how dangerous I think Mr. Tate is because, see, he got caught the last time he committed a robbery and a [kidnapping]. And, so, in this case, I doubt very seriously that these people in this house would have survived based upon what I saw from this proof.

After considering the applicable sentence range for each of Tate's eight convictions, the trial court imposed the maximum sentence within each range.[4] The court found Tate to be a "dangerous offender" under Tennessee Code Annotated section 40-35-115(b)(4) and ordered his sentences to be served consecutively for a total effective sentence of one-hundred-thirty-eight years' imprisonment. After the denial of his motion for new trial, Tate filed a timely notice of appeal.

## ANALYSIS

---

[4] For count one, Tate was convicted of attempted especially aggravated robbery (against Andrew Morrow) and received a twenty-year sentence. For count two, he was convicted of especially aggravated burglary (against Andrew Morrow) and received a twenty-year sentence. For count three, he was convicted of employment of a firearm during a felony offense and received a ten-year sentence. For count four, he was convicted of especially aggravated kidnapping (against M.B.) and received a forty-year sentence. For count five, he was convicted of aggravated kidnapping (against Tamika Jones) and received a twenty-year sentence. For counts six and seven, he was convicted of aggravated assault (against M.B. and Tamika Jones) and received a ten-year sentence on each count. For count eight, he was convicted of facilitation to commit aggravated assault (against Andrew Morrow) and received an eight-year sentence.

**I. White Instruction**. Based on State v. White, 362 S.W.3d 559 (2012), Tate contends that his "convictions for especially aggravated kidnapping and aggravated kidnapping offend due process because the conduct forming the bases of these convictions was 'essentially incidental' to the conduct forming the bases for his especially aggravated burglary conviction, attempted especially aggravated robbery and aggravated assault convictions." In response, the State contends that "the trial court's failure to define 'substantial interference with the victim's liberty' in the jury instructions for especially aggravated kidnapping and aggravated kidnapping" was harmless beyond a reasonable doubt. Upon our review, we agree with the State that the omission of the requisite White instruction was harmless error as the convictions for aggravated burglary, attempted especially aggravated robbery, and facilitation to commit aggravated assault (against Morrow). However, we disagree that the error was harmless beyond a reasonable doubt as to the aggravated assaults charged in counts six and seven (against M.B. and Jones).

Prior to State v. White, this court conducted an appellate due process review when a defendant challenged dual convictions involving a form of kidnapping and a separate felony offense. This due process analysis developed over time in cases such as State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), and its progeny. See, e.g., State v. Cozart, 54 S.W.3d 242 (Tenn. 2001), State v. Fuller, 172 S.W.3d 533 (Tenn. 2005), and State v. Richardson, 251 S.W.3d 438 (Tenn. 2008). In White, the supreme court expressly overruled this separate due process analysis conducted by the appellate courts. See White, 362 S.W.3d at 578. The court concluded that the Tennessee kidnapping statutes were not meant to apply to a removal or confinement of a victim that was "essentially incidental" to the accompanying felony and that this inquiry was a factual question for a properly instructed jury to resolve. Id. at 576-78. This is because the "essentially incidental" language in Anthony, which previously informed appellate due process review, was now deemed a part of a material element of kidnapping. Id. at 578 ("[W]e are merely providing definition for the element of the offense requiring that the removal or confinement constitute a substantial interference with the victim's liberty."). Accordingly, to protect the defendant's due process rights, trial courts must instruct juries to determine "whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." Id. at 578.

Based on the court's holding in White, the Tennessee Pattern Jury Instruction Committee adopted the following jury instruction to guide the trial courts:

To find the defendant guilty of [the charged kidnapping offense], you must also find beyond a reasonable doubt that the removal or confinement was to a greater degree than that necessary to commit the offense(s) of _____ as charged [or included] in count(s) _____. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:

(a) the nature and duration of the alleged victim's removal or confinement by the defendant;

(b) whether the removal or confinement occurred during the commission of the separate offense;

(c) whether the interference with the alleged victim's liberty was inherent in the nature of the separate offense;

(d) whether the removal or confinement prevented the alleged victim from summoning assistance, although the defendant need not have succeeded in preventing the alleged victim from doing so;

(e) whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

(f) whether the removal or confinement created a significant danger or increased the alleged victim's risk of harm independent of that posed by the separate offense.

Unless you find beyond a reasonable doubt that the alleged victim's removal or confinement exceeded that which was necessary to accomplish the alleged _____ and was not essentially incidental to it, you must find the defendant not guilty of [the charged kidnapping offense].

7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 8.01-.03, 8.05 (footnotes omitted) (citing White, 362 S.W.3d at 576-81).

A year and a half after its ruling in White, the supreme court provided further guidance regarding appellate review of dual convictions of kidnapping and other felony offenses in State v. Cecil, ___ S.W.3d ___, No. M2011-01210-SC-R11-CD, 2013 WL 4046608 (Tenn. Aug. 12, 2013). The court made it clear that the principles in White applied to all pending appellate actions as of the date of the White decision and to all actions arising thereafter. Cecil, ___ S.W.3d ___, at *8. Having clarified the scope of application of the

-13-

White ruling, the court concluded that the absence of a specific jury instruction as required under White constitutes error. Id. at *9. Moreover, "'[t]he failure to instruct the jury on a material element of an offense is a constitutional error subject to harmless error analysis.'" Id. at *10 (quoting State v. Faulkner, 154 S.W.3d 48, 60 (Tenn. 2005)). "The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). To determine if an error is harmless, the reviewing court must consider "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. (quoting State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002)). The court in Cecil emphasized that "the touchstone of this inquiry is whether a rational trier of fact could interpret the proof at trial in different ways." Cecil, ___ S.W.3d ___, at *10 (citing White, 362 S.W.3d at 579).

In the absence of the required White instruction, the resulting kidnapping conviction must be reversed and remanded for a new trial where the evidence was subject to differing interpretations and the proper jury instructions could have changed the outcome of the trial. See, e.g., State v. Reginald W. Davis, No. M2011-02075-CCA-R3-CD, 2012 WL 5947439, at *6 (Tenn. Crim. App. Nov. 16, 2012) and State v. Bobby A. Raymer, No. M2011-00995-CCA-R3-CD, 2012 WL 4841544, at *7 (Tenn. Crim. App. Oct. 10, 2012). However, the omission of the White instruction does not require reversal where the record supports a finding that the error was harmless beyond a reasonable doubt. Cecil, ___ S.W.3d ___, at *10 (citing as examples State v. Curtis Keller, No. W2012-00825-CCA-R3-CD, 2013 WL 3329032 (Tenn. Crim. App. June 27, 2013) and State v. Jonathan Kyle Hulse, No. E2011-01292-CCA-R3-CD, 2013 WL 1136528 (Tenn. Crim. App. Mar. 19, 2013)). Therefore, a reviewing court should determine from the record whether the proof is unequivocal that the victim's removal or confinement was not essentially incidental to the accompanying offense and that the jury's verdict would have been the same if it had been properly instructed. Cecil, ___ S.W.3d ___, at *12.

Here, Tate's trial occurred in October 2011, prior to the supreme court's decision in White. Consequently, the trial court did not require the jury to determine whether the victims' removal or confinement was incidental to the accompanying felonies or, in the alternative, were significant enough to stand alone. White, at 577. Because Tate's appeal was in the appellate pipeline at the time of the White decision, we must now determine whether, beyond a reasonable doubt, the jury's verdict would have been the same had it been provided with the instruction pursuant to White.

-14-

Tate maintains that the confinement of Ms. Jones and her son, M.B., was not beyond that necessary to commit the underlying felony offenses of especially aggravated burglary, attempted especially aggravated robbery, and the aggravated assaults. For the reasons that follow, we conclude that due process concerns are not implicated in dual convictions for aggravated burglary and kidnapping; thus, no jury instruction pursuant to White was required. We also conclude that the proof is unequivocal that the victims' removal or confinement had criminal significance above and beyond that necessary to consummate the attempted especially aggravated robbery. With respect to the aggravated assaults against M.B. and Jones as charged in counts six and seven, we are unable to conclude beyond a reasonable doubt that the jury's verdict would have been the same if it had been properly instructed regarding the charges for kidnapping and for aggravated assault against M.B. and Jones. We will address each of the accompanying felony offenses in turn.

Here, Tate was indicted, and convicted as charged, for especially aggravated burglary with intent to commit theft against Andrew Morrow. See id. § 39-14-404 (2010). We have reduced Tate's conviction from especially aggravated burglary to aggravated burglary, which we discuss in further detail later in this opinion. Although Tate argues that dual convictions for aggravated burglary and kidnapping violate due process, this Court has previously declined to extend the due process analysis adopted in Anthony to property related offenses such as burglary. See State v. Larry Jereller Alston, et. al., No. E2012-00431-CCA-R3-CD, 2013 WL 2382589, at * 11 (Tenn. Crim. App. Feb. 27, 2013) (collecting cases) (noting that "[u]nlike the 'modern, broadly-drawn kidnapping statutes' at issue in Anthony, there is no danger that the offenses of aggravated burglary or aggravated robbery "could literally overrun several other crimes""). In Anthony, the Supreme Court was concerned that proving one felony, the armed robbery, inherently and necessarily proved the elements of the second felony, kidnapping. Anthony, 817 S.W.2d at 303. However, where the offenses of conviction are narrowly defined by statute and require proof of different elements, as in this case, there is no due process violation. See State v. Ralph, 6 S.W.3d 251, 256 (Tenn. 1999); State v. Cowan, 46 S.W.3d 227, 235 (Tenn. Crim. App. Oct. 27, 2000). Accordingly, because the proof supporting the aggravated burglary in this case did not inherently involve unlawful confinement of the victim, we conclude that the kidnapping offense was not essentially incidental to the burglary offense. See State v. Zonge, 973 S.W.2d 250, 253 (Tenn. Crim. App. Oct. 9, 1997) (citing State v. Oller, 851 S.W.2d 841, 842-43 (Tenn. Crim. App.1992)). As the rationale in Anthony is inapplicable, no instruction pursuant to White was required. Tate is not entitled to relief on this issue.

Next, in the absence of the White instruction, we are required to determine whether the proof is unequivocal that the removal or confinement of Jones and M.B. was significant enough to support separate kidnapping convictions along with the conviction for the

-15-

attempted robbery of Morrow. Robbery "is the intentional or knowing theft of property from the person or another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2010). Especially aggravated robbery is a robbery that is "[a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a) (2010). Criminal attempt requires that the defendant intentionally take a "substantial step" toward committing the underlying offense. See, e.g., State v. Dickson, ___ S.W.3d ___, No. E2010-01781-SC-R11-CD, 2013 WL 5530670 (Tenn. Oct. 8, 2013) (holding that an accomplice took substantial step toward committing first degree murder to constitute criminal attempt); see also T.C.A. § 39-12-101(a) (2010). This court has previously held that a defendant's conduct in approaching a victim and pointing a gun at his head constituted a substantial step toward the commission of especially aggravated robbery. See State v. Webster, 81 S.W.3d 244 (Tenn. Crim. App. 2002), perm. app. denied (Tenn. July 1, 2002).

The record shows that the confinement of Jones and M.B. was greater than necessary to accomplish the attempted robbery of Morrow, especially in light of the fact that when they attempted to escape the bedroom, they were forced at gunpoint to return and remain there. Previously, this court has considered the lack of a White instruction to be harmless error and has affirmed kidnapping convictions in instances where the victim was prevented from escaping. See, e.g., Jonathan Kyle Hulse, 2013 WL 1136528 (affirming a conviction for especially aggravated kidnapping under harmless error review where the defendant raped the victim indoors, then chased the victim with a boxcutter after she fled outside, grabbed her by the ankles, dragged her along the sidewalk, and prevented her from summoning help); State v. Rochelle Bush, No. W2011-02721-CCA-R3-CD, 2013 WL 1197859, at *4 (Tenn. Crim. App. Mar. 25, 2013) (affirming the defendant's conviction for especially aggravated kidnapping committed during an aggravated robbery where the pregnant victim was prevented from leaving and the defendant held a knife to the victim's stomach and threatened to kill her even after all the money was stolen), perm. app. denied (Tenn. Sept. 18, 2013). In addition to preventing M.B. and Jones from escaping, the perpetrators placed a gun to the teenage victim's head as they demanded money and drugs from Morrow. The threat to kill M.B. increased the potential harm to him beyond that necessary to commit the attempted especially aggravated robbery of Morrow.[5] When the perpetrators entered the home, one of the men went to M.B.'s room and forced M.B. to show him around the house. After

---

[5] The fact that Morrow was the victim named in the attempted especially aggravated robbery indictment and Jones and M.B. were named as victims in the kidnapping-related indictments is of no consequence to our analysis because they were all subject to the same criminal episode. See, e.g., State v. Anthony, (dismissing six counts of aggravated kidnapping in multi-victim case in which a different victim was named in the count of aggravated robbery), overruled on other grounds by State v. White, 362 S.W.3d 559 (Tenn. 2012).

complying, M.B. was forced to lie on the floor in his mother's room, and one of the men put his foot on M.B.'s back and threw a sheet over M.B. and his mother. The perpetrators ransacked the victims' bedroom and repeatedly stated, "Where its [sic] at?" While one of the perpetrators was engaged in a struggle over the gun with Morrow, Jones and M.B. tried to flee from the bedroom. However, another perpetrator thwarted their attempt and forced them back into the room at gunpoint. When the perpetrators' demands were not met, one of the men held a gun to M.B.'s head and said, "'Look at this little boy. Do you see him? If you don't give me the stuff, we're going to kill him.'" Codefendant Keller testified at trial that Morrow was the target and that "[i]t weren't no intention about no kid - - Ms. Tamika Jones or nothing." The confinement of M.B. and Jones was extended in duration and they were prevented from escaping and summoning assistance. Such interference with their liberty was not inherent in the nature of the separate offense of attempted robbery. Consequently, no rational trier of fact could conclude from the proof that the removal or confinement of M.B. and Jones was essentially incidental to the attempted robbery. M.B. and his mother were clearly held as hostages until the perpetrators' efforts to get money were thwarted by the police. As such, the victims' confinement far exceeded that necessary to accomplish the attempted robbery.

The circumstances supporting the dual convictions for kidnapping and for aggravated assault against both M.B. and Jones are less clear. As charged in the indictment in counts six and seven against M.B. and Tamika Jones, a person commits aggravated assault when he or she "[u]ses or displays a deadly weapon" and "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." T.C.A. §§ 39-13-101, -102 (2010). As charged in counts four and five against M.B. and Tamika Jones, a person commits especially aggravated kidnapping when he or she "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty" and accomplishes such act "with a deadly weapon[.]" See T.C.A. §§ 39-13-302, -305(a)(1) (2010). The jury convicted Tate of the aggravated assaults as charged. Tate was also convicted of the especially aggravated kidnapping of M.B. and of the lesser-included offense of aggravated kidnapping of Tamika Jones. Because the convictions in counts four through seven arise from the same set of circumstances, that Tate threatened the safety of M.B. and Jones with a gun, the jury may have reached a different conclusion if it had been adequately instructed. Based on the record, a reasonable jury could find that Tate only intended to assault M.B. and Jones, and that any removal or confinement of the victims was incidental to the assaults. However, the record also supports a finding that the removal or confinement of the teenage victim and his mother had criminal significance beyond that necessary to accomplish the assaults against them. We conclude that the omission of the White instruction was reversible error because the jury's verdict could have been different if it had been properly instructed regarding the charges for kidnapping and for aggravated assaults against M.B. and Tamika Jones. See State v. Rodriguez, 254 S.W.3d at 371. Accordingly, to protect Tate's due process rights, we reverse

-17-

the kidnapping convictions charged under counts four and five and remand the matter for a new trial on those counts.

As to Tate's conviction under count eight for facilitation of aggravated assault against Andrew Morrow, we conclude that the proof is unequivocal that any movement or confinement of M.B. and Tamika Jones was not essentially incidental to the accompanying assault against Morrow. No rational trier of fact could interpret any removal or confinement of M.B. and Jones to be accomplished in furtherance of the assault against Morrow. Therefore, the omission of the White instruction was harmless beyond a reasonable doubt as to the conviction under count eight.

Accordingly, we conclude that there was unequivocal proof that the victims' removal or confinement was not essentially incidental to the facilitation of aggravated assault, attempted especially aggravated robbery, or the aggravated burglary. Because the jury's verdict would have been the same if it had been properly instructed on those counts, the omission of the White instruction was harmless beyond a reasonable doubt. However, Tate is entitled to relief on the issue of the dual convictions for kidnapping and for aggravated assault against M.B. and Jones because the proof supporting those convictions was subject to different interpretations and the instructional error was not harmless.

We are compelled to address two issues which were observed as plain error by this court in State v. Curtis Keller, No. W2012-00825-CCA-R3-CD, 2013 WL 3329032 (Tenn. Crim. App. June 27, 2013) (wherein State conceded plain error regarding trial court's failure to properly instruct jury on the charge of employing a firearm during the commission of a felony and finding dual convictions of especially aggravated burglary and attempted especially aggravated robbery violated Tennessee Code Annotated section 39-14-404(d)). In Curtis Keller, a case in which Tate's codefendant appealed his convictions stemming from the same trial, this court addressed whether the trial court properly instructed the jury on the charge of employing a firearm during the commission of a dangerous felony and whether Keller's dual convictions for especially aggravated burglary and attempted especially aggravated robbery violated Tennessee Code Annotated section 39-14-404(d). Upon our review, we likewise perceive plain error on this record. For the reasons outlined below, we reverse Tate's conviction for employing a firearm during the commission of a dangerous felony in count three and reduce his conviction of especially aggravated burglary to aggravated burglary in count two.

Neither of the above claims was included in Tate's motion for new trial or his brief to this court. These issues are therefore waived. See Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). This court may review an issue that has been waived and conclude that "plain error" exists if: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). All five factors must be established by the record before a court will find plain error. Id. at 283.

As in Curtis Keller, the record reflects that count three of the indictment charging employing a firearm during the commission of a dangerous offense did not specify which of the several possible felonies allegedly committed by Tate had given rise to the offense. While the trial court narrowed the potential felonies that qualified as a "dangerous felony" to especially aggravated kidnapping, aggravated kidnapping, especially aggravated burglary, and aggravated burglary, it failed to specify which of those four felonies was intended as the predicate crime. This is problematic because a person may not be charged with employing a firearm during the commission of a dangerous offense "if possessing or employing a firearm is an essential element of the underlying dangerous felony as charged[,]" T.C.A. § 39-17-1324(c) (2010), and the indictment charging Tate with especially aggravated kidnapping includes the use of a deadly weapon as an essential element of the offense. Accordingly, the State's failure to elect and the trial court's failure to specify to the jury which felony served as the predicate to Tate's conviction in count three may have resulted in his conviction based on an invalid predicate felony.

Under the above limited circumstances, this court has deemed consideration of a defendant's otherwise waived instructional error necessary to do substantial justice. State v. Trutonio Yancey and Bernard McThune, No. W2011-01543-CCA-R3-CD, 2012 WL 4057369, at *9 (Tenn. Crim. App. Sept.17, 2012) (holding that trial court committed plain error in not requiring the State to elect which felony it relied on to support charge of employing a firearm during a dangerous felony and observing that "in cases in which 'there is technically one offense, but evidence of multiple acts which would constitute the offense, a defendant is still entitled to the protection of unanimity[.]'") (quoting State v. Forbes, 918 S.W.2d 431, 446 (Tenn. Crim. App.1995)); State v. Jeremiah Dawson, No. W2010-02621-CCA-R3-CD, 2012 WL 1572214, at *8 (Tenn. Crim. App. May 2, 2012) (holding that the

State is required to elect when multiple dangerous felonies are alleged in indictment for violation of Code section 39-17-1324), perm. app. denied (Tenn. Sept. 20, 2012); State v. Michael L. Powell and Randall S. Horne, No. E2011-00155-CCA-R3-CD, 2012 WL 1655279, at *14 (Tenn. Crim. App. May 10, 2012) (same). Accordingly, Tate's conviction for employing a firearm during the commission of a dangerous felony is reversed and count three is remanded for new trial. Upon retrial, the only dangerous felony that may be considered by the jury is the aggravated burglary, which we address below.

Tate was convicted of especially aggravated burglary and attempted especially aggravated robbery. Tennessee Code Annotated section 39-14-404(d) states that "[a]cts which constitute an offense under [the especially aggravated burglary statute] may be prosecuted under this section or any other applicable section, but not both." T.C.A. § 39-14-404(d) (2010). "Subsection (d) prohibits using the same act to prosecute for especially aggravated burglary and another offense." State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993) (holding that T.C.A. § 39-14-404(d) precluded convictions for both especially aggravated burglary and aggravated rape when serious bodily injury was an element of both offenses); see also State v. Michael Dean Marlin, No. M2011-00125-CCA-R3-CD, 2011 WL 5825778, at *14 (Tenn. Crim. App. Nov.17, 2011) (holding that the "effect of subsection (d) is that the Defendant cannot be convicted of especially aggravated burglary and aggravated robbery when the serious bodily injury of [the victim] was an element of both offenses"). The appropriate remedy for improper dual convictions under Tennessee Code Annotated section 39-14-404(d) and other applicable sections is to modify the especially aggravated burglary conviction to aggravated burglary. See Holland, 860 S.W.2d at 60.

The record shows that serious bodily injury of Morrow was an element of especially aggravated burglary and attempted especially aggravated robbery. Thus, Tate's dual convictions for these offenses are precluded under section 39-14-404(d). See State v. Shanda Alene Wright, No. M2006-02343-CCA-R3-CD, 2008 WL 371258, at *7 (Tenn. Crim. App. Feb. 11, 2008) (holding that Tennessee Code Annotated section 39-14-404(d) precluded convictions for both especially aggravated burglary and especially aggravated robbery when serious bodily injury was an element of both offenses), perm. app. denied (Tenn. Oct. 27, 2008). Accordingly, we modify Tate's convictions for especially aggravated burglary to aggravated burglary, and we remand for resentencing on the aggravated burglary conviction. See id.; T.C.A. § 39-14-403.

**II. Sentencing**. Tate contends that the trial court erred in imposing excessive sentences for each of his convictions and erred in ordering that his sentences be served consecutively. In response, the State argues that the record supports the sentence in this case. We agree with the State.

We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Furthermore, the misapplication of enhancement or mitigating factors does not invalidate the imposed sentence "unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. This standard of review also applies to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

In Bise, the record reflected that the defendant participated in a burglary where no weapons were involved and the victim was not at home. Both tiers of our appellate courts agreed that the trial court erroneously applied the enhancement factor that the defendant had no hesitation about committing a crime when the risk to human life was high. See Bise, 380 S.W.3d at 708 (observing "that the Court of Criminal Appeals properly ruled that the evidence does not support the single enhancement factor applied by the trial court"). However, the supreme court reversed this court's downward adjustment of the defendant's sentence, holding that the record otherwise supported the trial court's imposed sentence. Morever, the supreme court in State v. Carter previously held that the appellate courts are bound to a trial court's imposition of a within-range sentence that is otherwise consistent with the purposes and principles of the Sentencing Act, even if we would have preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008) (reinstating the trial court's imposition of a minimum sentence despite expressing discomfort with the decision).

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40–35–113 and 40–35–114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2010); Carter, 254 S.W.3d at 343. The burden is on the appellant to demonstrate the impropriety of his sentence. See T.C.A. § 40-35-401, Sentencing Comm'n Cmts.

Here, Tate was convicted of attempted especially aggravated robbery, a Class B felony. See T.C.A. §§ 39-13-403, -12-107(a). As a Range II, multiple offender, he was subject to a sentence ranging between twelve and twenty years. See id. § 40-35-112(b)(2). As previously noted, we have reduced the especially aggravated burglary conviction in count two to aggravated burglary, a Class C felony, and we remand that particular conviction for resentencing. On remand, Tate is subject to a sentence between six and ten years as a Range II, multiple offender for the aggravated burglary conviction. See id. §§ 39-14-403, 40-35-112(b)(3). For his conviction of especially aggravated kidnapping, a Class A felony, Tate was subject to a sentence ranging between twenty-five and forty years. See id. §§ 39-13-305(b)(1), 40-35-112(b)(1). His conviction for aggravated kidnapping, a Class B felony, was subject to a sentence between twelve and twenty years. See id. §§ 39-13-304(b)(1), 40-35-112(b)(2). For the two counts of aggravated assault, Class C felonies, Tate was subject to sentences between six and ten years. See id. §§ 39-13-102(e)(1), 40-35-112(b)(3). For the facilitation to commit aggravated assault, a Class D felony, Tate was subject to a sentence ranging between four and eight years. See id. §§ 39-11-403, 40-35-112(b)(4). For these convictions, the trial court imposed the maximum sentence within each range.

On appeal, Tate argues that the trial court erred in applying three enhancement factors: (1) that the defendant has a previous criminal history in addition to that necessary to establish the range; enhancement factor (5), that the defendant acted with exceptional cruelty; and enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high. See id. §§ 40-35-114(1), (5), (10) (2010). Tate does not challenge the trial court's application of enhancement factors (2), (3), (8), and (9) (that he was the leader in the commission of the offense with two or more criminal actors; that the

offense involved more than one victim; that he previously failed to comply with the conditions of a sentence involving release into the community; and that he possessed a deadly weapon during the commission of aggravated burglary). See id. § 40-35-114(2), (3), (8), (9).

Tate challenges the trial court's application of enhancement factor (1). While conceding that he has two prior Class C felony convictions for kidnapping and robbery, Tate contends that his three misdemeanor convictions for possession of a controlled substance "are insufficient to justify enhancement pursuant to Tennessee Code Annotated section 40-35-114(1)." Tate further argues that, "[a]t the very least, the trial court should not have placed great weight in factor (1)." Initially, we note that, as a matter of law, while simple possession of a controlled substance is generally classified as a Class A misdemeanor, see T.C.A. § 39-17-418(c), a third offense under this section constitutes a Class E felony. See id. § 39-17-418(e) (2010). Moreover, this court has previously held that even a single misdemeanor conviction may support the enhancement of a sentence. See, e.g., State v. Willie Givens, No. M2000-02883-CCA-R3-CD, 2002 WL 1400049, at *18 (Tenn. Crim. App. June 28, 2002); State v. Leon James Anderson, No. M2004-00965-CCA-R3-CD, 2005 WL 1000235, at *5 (Tenn. Crim. App. April 29, 2005). As to Tate's argument that the trial court should not have placed "great weight" on enhancement factor (1), we note that "the 2005 amendments [to the Sentencing Act] deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." Carter, 254 S.W.3d at 344. Accordingly, the trial court did not err in applying this enhancement factor.

Tate argues that the trial court misapplied enhancement factor (5) as to his aggravated offenses because a proper application of this factor requires "evidence of exceptional cruelty separate and apart from the actions which constituted the offense[.]" State v. Poole, 945 S.W.2d 93, 99 (Tenn. 1997). The application of an enhancement factor is generally appropriate "if not already an essential element of the offense," T.C.A. § 40-35-114, and this court has held that exceptional cruelty is not necessarily an element of aggravated kidnapping, aggravated robbery, or especially aggravated kidnapping. See, e.g., State v. Kern, 909 S.W.2d 5, 7 (Tenn. Crim. App. 1993); State v. Robert Morrow, No. E2000-02796-CCA-R3-CD, 2001 WL 1105371, at *4 (Tenn. Crim. App. Sept. 18, 2001). While this court has stated that "'[a] threat of the victim being shot is inherent in the offense of an especially aggravated kidnapping that is committed by the use of a firearm[,]'" State v. Turner, 41 S.W.3d 663, 673 (Tenn. Crim. App. 2000) (quoting State v. Quinton Cage, No. 01C01-9605-CC-00179, 1999 WL 30595, at *10 (Tenn. Crim. App. Jan. 26, 1999), perm. app. denied (Tenn. July 12, 1999)), we find that there is ample evidence in the record to support the trial court's application of this enhancement factor to the offenses in the instant case. Morrow sustained at least ten blows to the head and received forty-two stitches and sixteen staples. In an effort to extort money and drugs, the perpetrators held a gun to M.B.

and threatened to kill him in front of his family. The victims were held at gun point in the corner of a bedroom until the perpetrators were thwarted by the arrival of the police. Other witnesses at trial testified as to the harsh treatment of the victims during the course of the attempted robbery. For instance, Officer Davidson observed Morrow with severe cuts and wearing a blood-soaked t-shirt. He also described the bedroom as covered in blood and in disarray. Blood and human hair were found on the magazine clip of the gun used to beat Morrow. Accordingly, the record establishes that Tate's actions were "separate and apart" from that necessary to constitute the aggravated offenses. See Poole, 945 S.W.2d at 99. Furthermore, even if the trial court erroneously applied this enhancement factor to some of Tate's convictions, the trial court did not otherwise abuse its discretion or depart from the purposes and principles of the Sentencing Act. See Bise, 380 S.W.3d at 702.

Finally, Tate challenges the trial court's application of enhancement factor (10) arguing that "[w]hen an offense is committed with a deadly weapon, it is inherent within the offense that there is a risk to human life and the potential for injury is great." In applying this factor, the trial court stated:

> I find No. 10 applies; that he had no hesitation about committing a crime when the risk to human life was high - other than, of course, the victims named in the indictment. There were other victims here that were present that were not named in the indictment. As I stated, it's my - after looking at this individual - and the way - the actions of the night in question, and also his previous record, you know, if it weren't for this young fellow in the closet calling the police this would have been a much, much, much worse situation, if you can imagine it and that other people were present whose lives were risked - were at risk. So, I find that does apply.

Previously, this court has held that when enhancement factor (10) is inherent in the charged offense, it may still be applied to enhance a sentence where the defendant's actions created a risk of harm to an individual other than the named victim. See, e.g., State v. Joe Carpenter Tyree, No. M2006-02173-CCA-R3-CD, 2007 WL 2295611, at *8 (Tenn. Crim. App. Aug. 10, 2007), perm. app. denied (Tenn. Jan. 28, 2008); see also State v. Imfeld, 70 S.W.3d 698, 707 (Tenn. 2002). Here, J.G. was not specifically named as a victim in the indicted offenses, and his life was actually at risk. Cf. State v. Jimmy Lee Whitmire, No. M2007-01389-CCA-R3-CD, 2009 WL 2486178 (Tenn. Crim. App. Aug. 13, 2009) (finding factor (10) to be inapplicable where the victim's children were asleep in their bedrooms, the defendant was unaware of their presence, and they were not in the immediate area of danger during the commission of the especially aggravated kidnapping, aggravated assault, and aggravated burglary against their mother). Accordingly, we conclude that this enhancement factor was properly applied.

Although Tate has not challenged the application of enhancement factor (3) to his sentences, we find that this application was erroneous as a matter of law. Generally, this factor should not be applied where, as here, the defendant is separately convicted of the offenses committed against each victim. See Imfeld, 70 S.W.3d at 705-06 ("[T]here cannot be multiple victims for any one offense . . . committed against a specific, named victim."). Here, the trial court applied enhancement factor (3) because "the indictment didn't contain the names of the other individuals who were placed in fear and were in essence, [kidnapped]." However, this court has previously held that a "victim," for purposes of sentence enhancement factor (3), "'is a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime.'" Cowan, 46 S.W.3d at 235 (quoting State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994)). Furthermore, "[t]he psychological injuries suffered by relatives witnessing an attack on the actual victim are not covered by this interpretation of the word 'victim.'" State v. Alexander, 957 S.W.2d 1, 6 (Tenn. Crim. App. 1997). Accordingly, the fact that J.G. was present and not named in the indictment, standing alone, is not sufficient to trigger the application of the "multiple victims" enhancement factor.

In this case, there was a separate offense for each specific, named victim. Thus, the trial court erred in applying this enhancement factor. Nevertheless, the misapplication of this enhancement factor does not remove the presumption of reasonableness of the imposed sentences. See Bise, 380 S.W.3d at 706 (holding that "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005.").

Because the statutory enhancement and mitigating factors are advisory only, and because "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion[,]" we conclude that the trial court did not err in its sentencing determinations where the record otherwise supports the within-range sentences imposed. See T.C.A. § 40-35-114(c)(2) (2010); Carter, 254 S.W.3d at 345.

Tate also challenges the trial court's imposition of consecutive sentencing. He maintains that the trial court failed to make the requisite Wilkerson findings to support his status as a "dangerous offender" under Tennessee Code Annotated section 40-35-115(b)(4) (2010). Specifically, Tate asserts that "the trial court did not explicitly state that consecutive sentences were necessary to further protect the public from [the Defendant-Appellant]."

Where a defendant is convicted of one or more offenses, the trial court generally has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a), (b) (2010). This court will not disturb the trial court's determination of concurrent or consecutive sentences absent an abuse of discretion. State v. Blouvet, 965

-25-

S.W.2d 489, 495 (Tenn. Crim. App. 1997). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in code section 40-35-115(b). Those categories include:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The defendant is sentenced for an offense committed while on probation; or
>
> (7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b) (2010). The finding of a single category is sufficient to authorize a court to impose consecutive sentences. Id., Sentencing Comm'n Cmts. Furthermore, an order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1) (2010). Additionally, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Id. § 40-35-103(2) (2010).

Here, the court determined that Tate was a dangerous offender. See id. § 40-35-115(b)(4). Although Tate argues that the trial court improperly determined that he was a

dangerous offender, we conclude that the trial court did not err in imposing consecutive sentencing. Regarding this subsection, the Tennessee Supreme Court has stated:

> "Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender."

Imfeld, 70 S.W.3d at 708 (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)) (emphasis added). Unlike the other six subsections, the trial court must make additional factual findings for the "dangerous offender" factor because it is "'the most subjective and hardest to apply.'" Id. (quoting State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)).

In concluding that Tate was a dangerous offender, the trial court stated:

> I find that he is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high; and I find that because – really, just – really, the facts of this case – coupled that with the fact that he was convicted of robbery and [kidnapping] before – like I said, he obviously didn't learn much from that. He had a violation of probation on that. But I think the circumstances surrounding this offense are particularly aggravated. The horror that must have gone through this family's brain. They testified, and it was very moving. You would have to be here to see it. The poor young man that was in the closet, I think was fifteen or sixteen years of age; and it almost brought people to tears when he testified; so, you would have to be here to see the emotion on his face; but this young man was terrified as well as the remaining people in the house. And as I already pointed out, it was just because of luck and the presence of mind to react quickly that this wasn't worse than what it is. I think that consecutive sentencing – the aggregate length of the sentences reasonably relates to the offense for which [Tate] stands convicted. . . . To me, the fact is, is that he is a dangerous, dangerous offender. . . . So, because of this, I'm going to order each of these to be run consecutive to one another. He is a dangerous offender; and as such, he should never have the opportunity to see

the streets of Memphis, Tennessee, again. I can only hope that that happens.

The record shows that the trial court made the additional factual findings required to determine that Tate was a dangerous offender. The court determined that Tate should be kept away from "the streets of Memphis." Furthermore, when given the opportunity to reconsider its sentencing decision at the motion for new trial hearing, the trial court stated:

> [A]s to the one-hundred-thirty-eight-year sentence, I still believe in light of the fact of his previous record and the particular facts of this case – the fact that this family was terrorized in this event and that Mr. Tate had previously been convicted of similar type charges – [kidnapping] – robbery, I believe. In light of all that, that was an appropriate sentence to protect society.

Accordingly, we conclude that the trial court properly exercised its discretion in ordering Tate to serve his sentences consecutively.

Here, the record reflects that the trial court carefully considered the evidence, the nature of the criminal conduct involved, the presentence report, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing consecutive, within-range sentences of confinement. Therefore, Tate has failed to establish that the trial court abused its discretion in imposing his sentences and he is not entitled to relief.

## CONCLUSION

After a thorough review of the record, the judgments of the Shelby County Criminal Court are affirmed in part, reversed in part, and remanded. Tate's convictions for one count of attempted especially aggravated robbery, one count of facilitation to commit aggravated assault, and two counts of aggravated assault are affirmed. We reverse the kidnapping convictions, as charged in counts four and five, and remand the matter for a new trial on those counts. We reduce Tate's conviction for especially aggravated burglary conviction to a conviction for aggravated burglary, and remand the matter for resentencing. Finally, we reverse the conviction for employing a firearm during the commission of a dangerous felony offense and remand for a new trial on count three. In all other respects, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE